COUNTY SHERIFF'S DEPARTMENT, VENTURA COUNTY SHERIFF'S DEPARTMENT, VENTURA COUNTY SHERIFF'S DEPARTMENT. And in fact, the Ninth Circuit has also indicated the same. In two cases, specifically Brosseau and in the Ninth Circuit case of Blanford, the courts have agreed that the Supreme Court has indicated that the generalized holdings or rationale from Tennessee v. Garner are not applicable unless they're on all fours, unless the facts are on all fours with Tennessee v. Garner. There are some obvious cases. But in cases that are not on all fours, the facts are not obvious. You have to have some threat to somebody. This is true. And why couldn't a jury looking at the facts here conclude there was no threat to anybody except himself, Mr. Daniels Jr.? Well, I think, Your Honor, to answer your question, first of all, the Court has indicated that a jury may find that Mr. Daniels was a threat. And if, in fact, he was, Vince Camus was entitled to qualified immunity. But that's an incorrect thought process or rationale, because if a court thought that James Daniels was, in fact, a danger to the occupants of the swim school, we wouldn't get to the qualified immunity problem. We wouldn't need to go there. There would be no Fourth Amendment violation. So the Court, in essence, did not go to the two-step analysis and determine whether on April 3rd or April 8th of 2003. I asked you a question. I'm sorry. Could a jury find there was no threat was your question? Yes. Perhaps a jury could. But what the facts today before us are undisputed facts. Why isn't that the end of the appeal? I'm sorry? Why isn't that the end of the appeal? Because there are undisputed facts at the time of the shooting that other cases like Brosseau and Blanford, similar situations, where there were reasonable fears of safety and public safety. What you're saying is there's no clearly established law. Is that what you're saying? That's what I'm saying, Your Honor. Well, go ahead and say it. I mean, it's called cognitive organization. We've got to know what you're talking about before we can understand what you're saying. Well, I'm sorry, Your Honor. What I'm saying is that on April 8th, 2003, the law was not clearly established with particularity that Vince Camus was put on proper notice or reasonable notice that his actions in stopping this individual was unconstitutional. He couldn't shoot to kill a guy who was no threat to anybody? He was not on notice of that? You know, if he was not on notice of that, he should not be given a badge and a gun. I'm sorry. I mean, your employer should just make sure that all of the people working for them, you know, all the people who have badges and guns, know you can't go around killing citizens unless they're a threat to somebody, an immediate threat to somebody. This is true. And in Blanford, this court found the same. There's no dispute about that. Your client does not have any misapprehension on that score. My client would not shoot an unarmed fleeing felon. That's not what I asked you. Listen to what I asked. Your client does not have any misapprehension. I mean, understands fully, right, that police officers may not shoot citizens who do not pose an immediate threat to themselves or others, okay? Sure. They do know that, right? Yes, they do, Your Honor. Okay. They don't think there's any doubt on that score. I do not. I do not. And they don't, right? And they don't, Your Honor. Okay. And they tell that to their officers, presumably. They train them that way. Right. That there has to be some – there has to be a threat to the public safety, yes. Okay. Well, why isn't that it? I mean, the law is clearly established that they can't shoot somebody who is not a threat. Well – And the facts here construed in the life most favorable to the plaintiff makes him not a threat. Why isn't that the case? Because the facts construed in life most favorable to the plaintiff are exactly the same facts of Brousseau and Blanford. They're identical. We have officers recently – Oh, they're nothing like – There's nothing like Brousseau and Blanford. In Blanford, the guy was headed into a house, which might have been occupied, carrying a weapon. There was no one between him and whoever was in the house. So the rationale there – and Blanford, if you look at Judge Nunes' assent, Blanford pushed the envelope quite far. He said, well, you know, he was going to this house. He didn't know it was his house. It could have been somebody else's house. He was carrying a sword. He had brandished a sword. He had threatened – or he had made sort of threatening moves. And there was no way to keep him from going into the house where there might be unarmed people who might be injured. In this case, if you read the facts consistent with the plaintiff's case, Mr. Daniels had turned away from the – from the driver where the – from the area where the people were, and he was – he, in fact, turned his back to the officer. There was nothing. In order for – in order for the – for him to get to anybody to harm, he would have had to go past the officer. Now, he come charging using his X-Acto knife. He come charging at the officer. Then maybe, yes, I think, you know, he might have been justified in shooting him. But the guy turns away. Who was in danger? Who was in danger, Your Honor? The officers, by the way, in Blanford, the first volley of shots was at a man who had turned their back to the deputies and who hadn't even gone into the backyard yet, who was – who was fired upon because they feared if they got – he got out of their sight, they wouldn't be able to stop him. Didn't they warn him? They did warn him. And Senior Deputy Camus warned – warned James Daniels at gunpoint by running up ahead of him – this is undisputed – by running up ahead of him, turning and saying, you can't go up any further, you can't go up there. There was a driveway leading to – leading up slightly. And he didn't, right? And he – and he continued – and he continued walking forward and he was fired upon. Those are the facts. I thought he turned away from the swimming pool. This one issue about whether he was veering left or right, Vince Camus never testified that he shot James Daniels because he thought he was turning right into the swim school. He shot him because he didn't want to let him go any further or he feared citizens would be coming out or had already gone to, just like in Brissot. Had Mr. – Really, just like in Blanford. Had Mr. Daniels committed a crime? Mr. Daniels had committed a misdemeanor crime. He had – he was not lawfully obeying orders to stop and put down a knife. 148. He was mentally ill. He was mentally ill. He was not a – he was – he had not committed a violent felony, but he was a danger to society. He was a danger to the public. Just like Brissot in his car had not committed a violent felony. His encounter with the officer couldn't be characterized as a 240 or a 242 of the California Penal Code, only a 148?  I would submit on that, yes, Your Honor. I think that – that the conduct of James Daniels – Judge Clark knows all of these sections by heart. Assault and battery is compared to resisting, 148. I would agree, Your Honor. I think that if you were to – if he were to have stopped that day and dropped the knife and got medical attention and, in fact, was arrested other than put on a mental hold for evaluation, the proper charge would have been 148 of the Penal Code. What was the threat that he posed at the time that he was shot? The threat was we have a deranged individual who is not only armed, unlike some of the cases that were cited by plaintiff's counsel, he's armed with a knife, and he's capable of using it because he's – he's tested it. He's testing it on his own self. And he's dangerous because there are young kids, confirmed young kids, swimming in a pool at a swim academy, and their parents have been told, get those kids out of here. And he's a threat. In the mind of Vince Camus, he's a threat, just like in the mind of the deputies in Blanford and in Briseau, that if he goes any further, he could contact these individuals and cause great bodily harm. That's Briseau and Blanford. In fact, in Blanford, they didn't even know that someone was home. Nobody was home in Blanford. Vince Camus knows there's dozens and dozens of kids and parents here. Vince Camus knows that. You know, I think you're misreading the record. At least you're certainly not reading it in the way that is most favorable to the non-moving party. In what way? I'm sorry. Well, according to the record as they presented, there was no one – there was no way that he could get to anybody else that might pose a danger without going past the officer. That he had, in fact, turned in the other direction, and there was no one else – I mean, all of the kids and the parents were behind the officer. And at the time that he was shot, he had actually turned away and wasn't heading in the other direction. That's what I read them to be saying. Now, if you think that's wrong, we can – I'm indicating, Your Honor, that the only way – the plaintiffs have indicated – our police have indicated that the only way he could have gotten to the swim school was by getting through or getting by Vince Camus. Vince Camus testified that he stopped James Camus – James Daniels from continuing advancing in the driveway for two reasons. One, in case he chose to go in the school. Or two, in case he encountered those who might have already evacuated the school. Because the parking lot here is a cul-de-sac. No pun intended. It's a dead end. There's no way out. You cannot go any further once you get into the parking lot of the swim school. And Vince knows the area, and he says, I don't want to let him get to an area where I can't stop him if the parents and children have already evacuated. Is this part of the test, quoting the Graham case, an officer may use deadly force to prevent escape, quote, where the officer has probable cause, pretty low standard, to believe that the suspect poses a threat of serious physical harm to the officers or others. Is that the test that we're looking at? I think that's a slice of the test, or it's another enunciation of the test, if you will. Essentially – Probable cause is not such a wide standard. Not just suspicion, not just speculation. It's the kind of thing that would allow you to get a warrant if, you know, you have probable cause. It's something – I mean, you can't just say, well, you know, I suspect there might be drugs in the house. It's possible. So can I get a warrant to search it? No, no, I don't think Judge Malloy would issue a warrant on that basis. I don't think it's part of the test to answer the question as to qualified immunity. I don't think it's part of the second prong test, no. I think the test is clearly, if you think that there was a Fourth Amendment violation here, clearly established Fourth Amendment violation, a right that needs to be protected, then you have to ask, on this day, was there a law clearly established that would prevent deputies in the same position as Vince Camus from using lethal force to stop people who could be dangerous to those in the area? Or do you have to wait or divine their intent or actually have children right in their path or make movements right to the front door before you stop them? We know in Blanford you don't because they fired upon him as he grounded the house. You can stop them all you want, and there are many ways in which officers can stop an individual. There were at least three officers on the scene there. We're talking about shooting to kill. And, you know, there's a big difference. You may trivialize the difference, but there's a big difference between stopping a suspect and keeping him from doing harm or keeping him from harming himself and shooting to kill. There is a big difference, which I don't think you or Officer Camus fully appreciated. Your Honor, I would just add there's no other. At least the jury could, it seems to me, could so determine. I would just add, Your Honor, that in shooting, in law enforcement, there is no shoot to kill, shoot not to kill. There's just shoot to stop. Now, killing is obviously something that happens. You want to quibble with my language? Fine. Shoot, okay? I admit it was lethal force, deadly force. But the intent by Vince Camus was not to shoot and kill James Daniels. Law enforcement shoots to stop the threat, and that's why he was fired upon during the first volley. Shot him seven times in the back. Because after the first four shots, Your Honor, he didn't go down. He continued moving north in the driveway. And when he went down, the facts show there was no more shots. And that's why in Blandford, this gentleman was shot two or three volleys, I believe, because the first volley did not prevent him from opening the gate and going into the backyard. What significance does the earlier encounter, the close encounter with the other officer have here, where he grabbed him by the jacket or whatever, and the person who ends up dead, did not provide any kind of resistance, didn't threaten the officer, nothing happened? Isn't that an important fact, that they knew he wasn't a threat to anybody? I don't think it's an important fact in that regard, Your Honor. I think it's an important fact to show he's not going to comply to law enforcement. And the positioning of the two at the time, one officer is hanging around over a fence holding onto a jacket. James Daniels is certainly able to get out of that jacket and flee. I don't think that shows that in some way down the road, he's going to be less or more compliant or less dangerous. I mean, we're talking about a gentleman who's not stable and he's armed with a sharp object. We're not talking about somebody who's unarmed. You're talking about a child, right? You're talking about a 16-year-old kid? We're talking about a 19-year-old kid. 19, okay. We're talking about a young man who's capable of inflicting harm on 6-year-olds and their parents if he contacts them in the parking lot. That's who we're talking about. Then you ought to be pretty confident that you'll win before a jury. And, you know, isn't this the kind of case that you and your clients will want to take to the community, have the jury say, yeah, what you did was fine and, you know, this is the way we want our police officers to act? This is a local jury. We'll be drawn from, you know, the local community. And they'll be able to pass on this. And the police department will be vindicated in that, yes, this is a good thing to do. This is how we want. I'm always a little surprised when I see police departments so reluctant to face the citizens and answer for their conduct. Your Honor, I would only answer. I don't know what the big problem is. I would only answer that, Your Honor, that the executive branch of government, law enforcement, has provided a qualified immunity to prevent them from having to endure lawsuits. We'll rule on your legal arguments for sure. I'm just saying, you know, you don't have to assert it. And I would think that having done this and feeling justified, you'd be very happy to take it to a group of citizens and say, look, what we did, we're not embarrassed about it. What we did was the right thing. And we think Officer Camus deserves an accommodation for killing this 19-year-old kid who hadn't threatened anybody. We think this is good, solid law enforcement. Your Honor, we don't give accommodations. Even if they come back with a defense verdict, Officer Camus can feel like, you know, he's done well. Your Honor, we don't give accommodations for officers because they kill unarmed defensive people. Maybe you should. This person was armed. I just wanted to make sure the record's clear. This person was armed. And if he — You think I don't know this? No. And if — You think I missed that fact? No, Your Honor. This person was armed, and he was dangerous because he's delusional. Why would a reasonable officer opine reasonably that this person can be trusted? You don't want to go before a jury. If — obviously — You don't want to go before a jury. Your Honor, obviously, if this case, if qualified immunity is not granted, we will go before a jury. That would be our only option, absent settlement. But I'm just saying today that, like in Blanford and Brousseau, this deputy is entitled to qualified immunity. If I were you, I'd go to the jury. Get the jury to say it's okay. Why don't we save the rest of your time for rebuttal? Thank you, Your Honor. I appreciate it. Good morning, Your Honors. Peter Williams, Senate Peering, on behalf of the plaintiffs and appellees. Since 1985, the law in this country has been clearly established that police officer may not use deadly force against a fleeing suspect unless it's necessary to prevent the suspect's escape and the suspect poses a significant threat of death or serious physical injury. There's been a lot of water under the bridge since 1985. 1985 was a year I got appointed to this Court, and a lot of water under the bridge. Twenty-two years ago, right? That's true, and there's certainly been a lot of case law in this area. And particularly unhelpful to you is Hagan v. Brousseau and Blanford. Blanford in particular is highly unhelpful to you. Well, I don't think so. It sure doesn't help, that's for sure. Well, the distinction between Blanford in this case is that, first of all, Blanford had a two-and-a-half-foot samurai sword, a major distinguishing factor. I thought it was a Civil War sword. Okay. Well, it makes a difference. I mean, a samurai sword suggests... I recall it being a samurai sword. The hijackers had box cutters. I beg your pardon? I'm sorry, I didn't hear you. The hijackers had box cutters. I'm not in any way diminishing the fact that Mr. Daniels had a knife. Yes, you are. What I'm saying, however, is that in the perception of the potential harm to people, there's a big distinction between a two-and-a-half-foot sword and a three-quarter-inch X-Acto knife. Well, a three-quarter-inch box cutter. What should a police officer have done under these circumstances? The most significant... What would the law demand? Okay. Well, the law demands that the officer act reasonably. Yeah, how? Now, the question is... Tell me. You're the officer. You're out in the street now. You know the facts. What do you do? In this case, the most important tool in the officer's arsenal was patience. They had followed this gentleman for ten minutes. He had not threatened anyone during that entire ten minutes. In fact, he had done just the opposite, as Judge Malloy pointed out, when he encountered Officer Fuller. He had placed the X-Acto knife... Why follow him if he's not an immediate threat? Why follow him? Well, he was a threat to himself. There's no doubt about that. And Camus has consistently said that his intention was not to arrest this man. It was to take him in on a Welfare and Institutions Code section 5150 hold, a psychiatric hold. So that's what they should have done. They continued to follow him. The event was slowing down. At the time of the shooting, Mr. Daniels was walking at a fast pace, but according to the officers, he was slowing down. He was bleeding. All they had to do was continue to follow him. His intention apparently was to go over another wall. The officers had already scaled a wall following him. So all they had to do was continue to follow him. They were within 15 feet of this gentleman. Until what? Until he goes to sleep? Until he collapsed, until he tired, and just dropped to the ground. That's right. Well, they could have surrounded him. They could have done a lot of it. I don't think they should have. Right. There are various ways to contain him short of having him go to sleep. Sure. And there's also other alternative means that they could have used, although I know Your Honor has talked about this in the Smith v. Henry case. But they had, according to witnesses, they had a less lethal shotgun available to them. The officers deny this, but eyewitnesses say they saw it. They could have tried to use the bean bag shotgun again to bring him down. Anything that was less lethal than using a gun to shoot this man eight times. They tried that once. I'm sorry? They tried it. They tried it. They tried it and they missed. According to the testimony of Officer Welty, Daniels was 25 feet away when he fired. That's the maximum range of the less lethal shotgun. Officer Welty testified that he believed that he had missed. So they could have tried it again. It was available. It was there. That's certainly better than shooting him eight times. What is the less lethal shotgun? What does it do? It shoots essentially a propellant that's a bean bag at high velocity, and it's meant to basically take somebody down. And they had it available to them. I see. And so if you are at the very outer limits of its range, then it would presumably hit the body with very little force, and the closer you get to the individual, the more. The more velocity. That's correct. However, in this case, Welty said he thinks he missed. He didn't even hit him. So, and there was no indications on the body to suggest at autopsy that he had marks from the bean bag shotgun. LAPD tried bean bag guns way back when and discovered that if you got close enough to knock somebody down, they shattered internal organs. So they didn't use them. Shattered internal organs. Judge Trott, it's a good point. What about, you asked me what are the alternatives. What about a baton? Kelly had his baton out. He could have certainly tried to approach him. The history here is interesting. The history is interesting. Thirty years ago, every cop in the country would have shot the guy. Tennessee versus Garner came along and said, no, you can't do that. So LAPD said, what do we do? Just talking about LAPD now. And they said, well, choke holds. So they started using the choke hold, the sleeper hold. Well, the sleeper hold started killing people. So they banned the sleeper hold. So they said, well, we can't shoot him. We can't use the sleeper hold. What do we use? They said, well, the baton. Well, Rodney King ended the baton. And so the police want to know, well, you can't shoot him. You can't use the sleeper hold. You can't use the baton, the bean bag gun. How do you grapple with somebody like this? It's not a – tasers kill people, too. The point is force sometimes kills. The question is whether this was a reasonable mistake or not. Well, it wasn't reasonable because – Well, if he had died as a result of a taser attack, he wouldn't be here, I assume. It depends. I'm litigating currently taser cases. I know a little bit about it. Yeah, right. Okay. But those have to do with the application of multiple tasers over a long duration of time. One or two tasers, there's really been very little evidence to suggest that the use of a taser, one or two applications, kills people. They even came up – they came up with glue guns. We're going to shoot him with glue. And then they discovered that was suffocating people. We're going to use nets. I mean, the attempts that law enforcement has gone through to try to figure out ways to grapple with people like this. Dogs. Dogs. Dogs. And then the dog, you know, shoe versus gait. You can't put a dog on the guy. It's a tricky situation. Why not, Ben, Your Honor, wait it out? What was the rush? What was the hurry? He wasn't threatening anyone. The rush is the guy all of a sudden takes somebody as a hostage. Somebody else comes out into the immediate range of this guy. He's got blood on him. Blood has AIDS in it. It's a tricky situation. It's a tricky situation, but the law is clear that you don't shoot someone who is not threatening anybody. Do you know how many officers get bitten trying to grapple with people like this? Well, I think what you're advocating then, and I hope you're not, but I think you're advocating then that under any circumstances where an individual walks away from an officer and doesn't, you know, comply, that they're entitled to be shot. And I don't think that's the law. I don't think that's the correct interpretation of it. But aren't you just asking to try this case to a jury? Absolutely. I mean, we can let the community decide whether tasers or whether guns or bullets or beanbags or dogs or glue, that's the whole point of a jury trial, isn't it? That is exactly what I'm asking for, Your Honors. Let the jury decide. Ultimately, the jury will tell me, yes, you have a case, or no, you don't. But it's up to the 12 people sitting in the box to make that determination. We only give you about eight or seven. Whatever number. I'll take whatever you give me. Some such truncated number. Unless the Court has any further questions, I have nothing further. Thank you, Your Honors. Thank you. The case is signed. We'll finish in a minute. Oh, yes. You did have some time. Did you have some time left over? Yes. Three minutes. So it's all yours. Thank you, Your Honor. I just will be very brief. I just perhaps, Mr. Williamson, just by mistake. Maybe if you speak quickly. The coroner did testify in that position and indicated that she believed there was a mark consistent with the beanbag propellant on the shoulder area of Mr. Daniels. So it's consistent that he may have actually been struck. The bottom line is, is this man was struck eight times with a 9-millimeter service weapon. The first four, no effect. Are we going to speculate that the beanbag was going to knock him down? Everybody with 9 millimeters can't stop anymore. Well, the 9-millimeter comes out of the muzzle a lot faster and a lot harder than the beanbag shotgun. And four rounds don't knock this person down. In fact, after the eighth round, he finally goes down. My point is just that we can speculate all day long about what they hit him with, but that's speculation. The problem with bullets is they go through. The body doesn't take the impact. If they go through a soft part of the body, they don't leave any of their impact on the body. They just go right through. So that doesn't tell us anything at all. Well, I'm just saying, Your Honor, that it's speculation that other items might have worked better. That's just my point there. And really, in closing, what I want to add is that His Honor asked, isn't what the plaintiffs really want is an opportunity to have a trial? Well, in this land, police officers are entitled to not have to go to trial if there is not to pinpoint them with some type of notice. That's the law. That what they're about to do could violate someone's constitutional rights. That's why the deputies in Blanford and that's why the deputies in Brosseau did not have to go to trial. And that is why I am here, because Deputy Camus does not have to go to trial, because qualified immunity allows that. I think he'd be anxious to go to trial. He'd want to. Your Honor, I don't think any police officers are anxious. I apologize. I don't think any officers are anxious to go to trial, Your Honor. I don't think you'll get any indication from a jury. You know, you have very little risk. If the jury finds against you, you're not going to pay the judgment. Somebody else is going to pay the judgment. And the jury could say, yeah, this guy was right. He did exactly right. And, you know, I would think he'd feel like that's what he wants to do. I would commend to you the recent article by Judge Young in the Suffolk Law Review that talks about the vanishing jury trial. And I think his point is well taken, and that is that we're not summary judgment courts. We're supposed to be trial courts, and that we've come to the point where procedural impediments to getting issues before the jury have become so significant that you never have a jury trial. And when there are fact questions and when the trial judge says there's no qualified immunity here, why not try it and find out? Because, Your Honor, in this case, if what Vince Camus did is on all fours with Blanford, then he's entitled not to have to go through that. Well, it isn't on all fours with Blanford, because in Blanford they said stop or we'll kill you, or stop, we'll shoot you. They did not say that here, did they? What Vince Camus said, Your Honor. Did they say that? No, he said at gunpoint, you cannot go any further. You cannot go up there. At gunpoint, I think 80 to 90 percent of communication is nonverbal. And if a weapon is pointed at me and a deputy in uniform from the County of Ventura says, you cannot go any further, I know what he means if I continue to go further. He doesn't have to say the words, or I'm going to pull this trigger. Why would he be pointing that weapon at me? Why would that weapon even be out of his holster, Your Honor? He was warned, and he continued to advance north in the driveway, and that's when he was fired upon. And ultimately, the rationale from Blanford, the rationale from Brosseau applies to this case, and that's why I'm here, because qualified immunity is applicable to this defendant. Thank you. Thank you, sir. Well, here's just how you will stand for a minute. Thank you, Your Honor. We are adjourned.
judges: Kozinski, Trott. Molloy